# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1) BILLIE WILLIS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.: 5:22-CV-349-SLP** |
| | ) | |
| **(1) PROGRESSIVE DIRECT** | ) | |
| **INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
_____

Respectfully Submitted by:

**STARR, BEGIN & KING**

s/Bradley E. Bowlby_____
Christopher C. King, OBA #18578
Bradley E. Bowlby, OBA #22847
1800 S. Baltimore, Ste 550
Tulsa, OK 74119
Tel:    (918) 872-0374
Fax:    (918) 872-0381
Email: kris.king@tulsalawyer.org
        brad.bowlby@tulsalawyer.org
*Attorneys for Defendant Progressive*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. 2

TABLE OF AUTHORITIES ......................................................................................... 3

INTRODUCTION ........................................................................................................ 4

UNDISPUTED MATERIAL FACTS ........................................................................... 5

SUMMARY JUDGMENT ............................................................................................ 15

ARGUMENT AND AUTHORITIES .......................................................................... 16

   I.  PROGRESSIVE IS ENTITLED TO SUMMARY JUDGMENT AS TO THE PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT .................................... 16

  II.  PROGRESSIVE IS ENTITLED TO SUMMARY JUDGMENT AS TO THE PLAINTIFF'S CLAIM FOR BAD FAITH ........................................................... 17

      A.  Progressive evaluated the results of its investigation properly ......................... 20

         1.  Progressive may consider adjustments a claimant's medical providers make to their bills when evaluating a UM/UIM claim ........................... 20

         2.  Progressive properly discounted Plaintiff's medical providers' administrative charges for the filing of liens regarding their bills ....... 23

      B.  Progressive performed a proper investigation .................................................. 26

 III. PROGRESSIVE IS ENTITLED TO SUMMARY JUDGMENT AS TO THE PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES ......................................... 27

CONCLUSION ............................................................................................................ 28

CERTIFICATE OF SERVICE ..................................................................................... 29

# TABLE OF AUTHORITIES

Fed.R.Civ.P. 56.................................................................................................... 15

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548 ................................... 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 ....................... 15

*Kendall v. Watkins*, 998 F.2d 848 (10th Cir.1993) .......................................... 15

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348 . 15

*Garratt v. Walker*, 164 F.3d 1249 (10th Cir.1998) ........................................... 16

*Universal Underwriters, Ins. Co. v. Winton*, 818 F.3d 1103 (10th Cir. 2016) ................ 16

*Everaard v. Hartford Accident & Indem. Co.*, 842 F.2d 1186 (10th Cir. 1988) ............. 16

36 O.S. § 3636(B) .............................................................................................. 16

*Christian v. Am. Home Assur. Co.*, 1977 OK 141, 577 P.2d 899 ...................... 17

Inst. No. 22.5, OUJI 3d (Rev. 2009) ................................................................. 18

Inst. No. 22.2, OUJI 3d (Rev. 2009) ................................................................. 18

*Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431 (10th Cir. 1993) ......... 18, 19

*Brown v. Patel*, 2007 OK 16, 157 P.3d 117 ...................................................... 18

*McCorkle v. Great Atlantic Ins. Co.*, 1981 OK 128, 637 P.2d 583) ................. 18

*Garnett v. Government Employees Ins. Co.*, 2008 OK 43, 186 P.3d 935 .......... 18, 19

*Perry v. Safeco Ins. Co. of America*, 18-cv-539-TCK-FHM (N.D. Okla. 2020) ............. 21

12 O.S. 3009.1(C) ................................................................................... 21, 22, 23

*Davis v. Mid-Century Ins. Co.*, 311 F.3d 1250 (10thCir. 2002) ....................... 23

*Skinner v. John Deer Ins. Co.*, 2000 OK 18, 998 P.2d 1219............................. 23

*Higgins v. State Auto Prop. & Cas. Ins. Co.*, 11-cv-90-JHP-TLW (N.D. Okla. 2012) . 23

**COMES NOW** the Defendant, Progressive Direct Insurance Company ("Progressive"), by and through its attorneys of record of the law firm of Starr, Begin & King, PLLC, and hereby moves for an order of summary judgment in this matter. In support, Progressive would state and aver as follows:

<u>**INTRODUCTION**</u>

This is an action for breach of contract and bad-faith handling of a first party claim for uninsured/underinsured motorist (UM/UIM) coverage. On September 9, 2021, Billie Willis was involved in a two-vehicle collision with non-party Jessica Maddox. At the time, Willis was a party to a contract for insurance with Progressive that included uninsured/underinsured motorist (UM/UIM) coverage in the amount of $25,000.00. Willis subsequently settled with Maddox for the $25,000.00 liability limits of her policy, then demanded his UM/UIM policy limits from Progressive.

Progressive's evaluation of the materials submitted by Willis' counsel showed that Willis's damages did not amount to $25,000.00. Progressive invited Willis to submit any additional information to support his claim. After Willis did so, Progressive reevaluated the claim. While the damages amount increased, the materials still did not show a claim amounting to $25,000.00. Now, Willis brings suit against Progressive for alleged breach of the insurance contract and bad faith handling of his UM/UIM claim.

Plaintiff argues that Progressive failed to uncover two of his medical bills or take certain of his personal circumstances into account, and, thus, failed to properly and promptly investigate his UM/UIM claim. The Plaintiff further argues that Progressive failed to properly evaluate the results of its investigation. The Plaintiff argues that, when

evaluating the economic damages aspect of his claim, Progressive wrongfully discounted adjustments/write offs and lien filing fees from the Plaintiff's medical providers' bills.

Progressive is entitled to summary judgment for breach of contract because the Plaintiff's UM/UIM claim never amounted to $25,000.00. Although the parties agree that the non-economic damages range of the Plaintiff's claim was $8,000 – $13,000.00, the amount he was "legally entitled to collect" from Maddox for economic damages/medical specials did not amount to $12,000.00. While the Plaintiffs medical bills total $28,249.46, Oklahoma law only allows him to recover the amounts paid, which total only $9,022.43.

As for bad faith, the record shows that the most generous reading of the Plaintiff's argument is that the law regarding a UM/UIM carrier's consideration of paid v. billed amounts is unsettled. Further, the record shows that Progressive promptly and reasonably investigated the Plaintiff's UM/UIM claim.

Finally, no reasonable jury could find that Progressive breached its duty of good faith either intentionally, with malice, or with reckless disregard for said duty.

## UNDISPUTED MATERIAL FACTS

### Events That Occurred Prior to the September 2021 Accident

1. On May 28, 1981, Plaintiff (age 18 at the time) was driving a motorcycle 115 mph on an Oklahoma county road when he lost control. Plaintiff was thrown 80 feet from the motorcycle. As a result, Plaintiff's spinal cord was severed at T-5, rendering him a paraplegic. *See* Ex. "1": Pl.s Depo, p 36:24 – 43:14.

2. Unfortunately, on June 16, 2019, Plaintiff was involved in another automobile accident. *See* Ex. "12": Kansas Motor Vehicle Crash Report. Plaintiff had just finished competing in a hand cycling event in Wichita, Kansas and was returning to Oklahoma. A young lady ran a stop sign and impacted the vehicle Plaintiff was riding in as a passenger, causing the vehicle to roll over. Plaintiff was extracted from the vehicle and rushed to the emergency room as a "code yellow – possible serious injuries." *Id*.

3. After the 2019 accident, Plaintiff hired attorney Kevin Bennett to assist him with his personal injury claim. *See* Ex. "13": Corresp. to Farm Bureau, 08/01/19.

4. After the 2019 accident, Plaintiff sought treatment at The Broadway Clinic, where he complained of and was diagnosed with "significant" injuries to his neck, back, shoulders, wrists, and hands (radiating pain from his neck, down both shoulders, and to both hands and his fingers), coupled with post-traumatic stress and anxiety. *See* Ex. "1": Pl.'s Depo, p. 88:6-23; 93:2-10; 98:20 – 99:17; 158:11-20. Eventually, in February 2020, it was recommended by Plaintiff's doctors that Plaintiff undergo surgery on his shoulder and left hand to reduce the pain. *See Id*. at p. 97:2-14.

5. In August 2020, Mr. Bennett sent correspondence to Farm Bureau (the liability carrier) advising that Plaintiff had incurred or would incur in excess of $100,000.00 in medical bills for medical treatment related to the 2019 accident. Mr. Bennett specifically advised Farm Bureau that Plaintiff would need a complete shoulder replacement surgery. *See* Ex. "14": Corresp. to Farm Bureau, 08/17/20.

6. As a result of the 2019 accident and his injuries, Plaintiff could not properly care for his wife. *See* Ex. "1": Pl.'s Depo, p. 84:2-7; 87:19 – 88:5. Plaintiff could also no longer work as a car salesman. *Id*. at p. 22:3-8. Plaintiff filed for Social Security Disability because of paralysis and his shoulder injury. *Id*. at p. 79:14 – 81:22.

Events that Occurred After the September 2021 Accident

7. Plaintiff never had surgery on his left hand or shoulder. As a result, he was still having pain that impacted his ability utilize a wheelchair at the time of the 2021 accident. *See* Ex. "1": Pl.'s Depo., p. 129:7-15. The day before the 2021 accident, Plaintiff admits he was still having pain in his wrists and hands while using a wheelchair because of the injuries received in the 2019 accident. *Id*. at p. 187:20-25.

8. After the 2021 accident Plaintiff was transported to Integris Hospital. At the Emergency Room, Plaintiff <u>denied</u> any neck pain, head pain, or upper back pain. Rather, Plaintiff complained of right flank pain. After spending approximately 3 ½ hours in the ER, during which time multiple CT scans were taken demonstrating no acute injury, Plaintiff was discharged. *See* Ex. "1": Pl.'s Depo., p 151:21 – 154:9.

9. Plaintiff then reported to The Broadway Clinic the exact same injuries that he complained of due to the 2019 accident. *See* Ex. "1": Pl.'s Depo., p 155:8 – 156:17.

10. After the 2021 accident, Plaintiff obtained medical treatment for approximately 14 weeks. The following chart demonstrates the original amount of each bill, the reductions to each bill, the payment on each bill and the amount still owed by Plaintiff:

| DATE | PROVIDER | BILLED | REDUCTIONS | PAID | OWED |
|---|---|---|---|---|---|
| 09/09/21 | Integris | $16,003.45 | $14,605.73 | $1,397.72 | $0.00 |
| 09/09/21 | EMSA | $1,338.00 | $604.00 | $734.00 | $0.00 |
| 09/09/21 | OEP, LLC | $1,379.00 | $1,188.52 | $190.48 | $0.00 |
| 09/09/21 | Radiology Ass. | $540.02 | $342.78 | $197.24 | $0.00 |
| 09--12/21 | Broadway Clinic | $2,920.00 | $620.00 | $2,300.00 | $0.00 |
| 10--21/21 | Physical Therapy | $4,466.00 | $1,366.00 | $3,100.00 | $0.00 |
| 12/02/21 | Midtown Img. | $1,600.00 | $500.00 | $1,100.00 | $0.00 |
| 09/10/21 | Walgreens | $2.99 | $0.00 | $2.99 | $0.00 |
| **TOTAL** | | **$28,249.46** | **$19,227.03** | **$9,022.43** | **$0.00** |

All of Plaintiff's medical bills he relates to the 2021 accident have been paid in full and reflect zero balances. *See* Ex. "15": Pl.'s Billing Records.

11. After the 2021 accident, Plaintiff was able to resume bow hunting. Specifically, during the deer season spanning October 1, 2021, to January 15, 2022, Plaintiff was able to kill 3 doe and 1 buck (a score of 165). *See* Ex. "1": Pl.'s Depo, p. 29:5 – 32:16.

12. After the 2021 accident, Plaintiff was able to resume competing in hand cycling events. On October 3, 2021 (24 days after the 2021 accident), Plaintiff competed in the hand cycling event at the Oklahoma City Memorial Marathon, finishing the 26.2-mile course in 1:47:09 for a second-place finish. *See* Ex. "1": Pl.'s Depo., p. 49:21 – 56:25; *see*

8

*also* Ex. "16": Leaderboard.  Plaintiff was also able to compete in the Endeavor Games in June 2022. Specifically, in the 15k hand cycling event, Plaintiff was able to complete the time trial in 33:52 for a 7th place finish.  *See* Ex. "1": Pl.'s Depo. pp. 57:15 – 59:12; *see also* Ex. "17": Endeavor Results.

Progressive's Handling of Plaintiff's UIM Claim Arising from the 2021 Accident

13. On September 13, 2021, Progressive took a recorded statement of Plaintiff and his wife to discuss how the accident occurred and what Plaintiff's injuries were.  *See* Ex. "18": Trans. of Call.  On the call Progressive learned Plaintiff was a paraplegic.  Plaintiff's wife told Progressive that Plaintiff "started having pains in his neck and the upper part of shoulder..." the day after the accident (this was not accurate given Plaintiff was still experiencing neck and shoulder pain due to the 2019 accident).  *Id*. at p. 2:16-24. Nonetheless, Progressive asked Plaintiff: "how you doing?" Plaintiff responded he was "still in some pain" but he was "trying to hang in there".  *Id*. at pp, 12:22 – 13:1.

14. The next day Mr. Bennett advised another insurance company Plaintiff had suffered "bodily injuries" due to an accident. *See* Ex. "19": Lttr to U.S.A.A., 09/14/21.

15. On October 14, 2021, Progressive sent correspondence to Plaintiff advising him that he had $25,000.00 in UIM coverage available to him for the 2021 accident should the need arise. *See* Ex. "20": Corresp. from Progressive to Plaintiff.  Progressive has never reduced the coverage available to Plaintiff under the subject policy of insurance.  *See* Ex. "8": McMillen Depo. p. 71:1-22; *see also* Ex. "2": Aff. of McMillen, ¶ 6.

16. February 25, 2022, is the first date Plaintiff submitted a UIM claim to Progressive. *See* Ex. "21": Lttr, dated 02/25/22; *see also* Ex. "2": Aff. of McMillen, ¶ 7.

17. On that same date, Progressive opened a UIM feature for Plaintiff and assigned the feature to employee Michael Roell ("Roell") for handling. Roell immediately called Mr. Bennett to discuss Plaintiff's UIM claim. At that time, Roell learned from Mr. Bennett that: (1) Plaintiff had been a paraplegic for 40 years; (2) Plaintiff had been very active and participated in hand cycling events but was injured in an accident in 2019; (3) Plaintiff had surgery for his shoulder injury due to the 2019 accident but Plaintiff was getting close to being back to normal when the 2021 accident occurred; (4) Plaintiff's medical bills likely exceeded $25,000.00 due to the 2021 accident; and (5) U.S.A.A.'s liability limits were $25,000.00 and those limits had been tendered. *See* Ex. "5": Claim Notes, p. 12; *see also* Ex. "24": Aff. of Roell, ¶ 2.

18. After speaking with Mr. Bennett on February 25, 2022, Roell sent correspondence to Mr. Bennett again confirming UIM coverage of $25,000.00 and stating that in order to complete an evaluation Progressive would need Plaintiff's medical bills and medical records and a list of the treating providers. *See* Ex. "22": Corresp. dated 2/25/22.

19. On or about March 6, 2022, Progressive received from Plaintiff's counsel a one-page letter and corresponding documents ("Demand Letter"). *See* Ex. "23": Corresp., dated 03/01/22; *see also* Ex. "2": Aff. of McMillen, ¶ 3. The Demand Letter enclosed the majority – but not all – of Plaintiff's medical records and bills Plaintiff related to the accident and a signed (but not dated) medical authorization. Plaintiff's counsel failed to

include the radiologist billing and the EMSA billing and records. The Medical Authorization provided could not be used by Progressive even if it had decided to order the missing records and bills because Plaintiff did not date the document. *See* Ex. "2": Aff. of McMillen, ¶ 3.

20. Mr. Bennett provided an incomplete itemization of medical billing (for example the amount of billing listed for EMSA is "$____") with a total listed as $25,529.00. The Demand Letter did not provide any radiology billing. *See* Ex. "2": Aff. of McMillen, ¶ 3.

21. Defendant investigated whether there was an EMSA bill by speaking directly with Mr. Bennett about it. *See* Ex. "4": Depo. of Roell, p. 63:4-8; *see also* Ex. "5": Claim Notes, 3/9/22 at 4:59 EST. Mr. Bennett advised he was unable to obtain the EMSA bill and that in Mr. Bennett's opinion the EMSA bill did not affect the overall value of the claim. *Id*. Progressive specifically asked Mr. Bennett to provide the bill but it was never provided before Plaintiff filed suit against Progressive. *See* Ex. "4": Depo of Roell, p. 76:13-18. Likewise, Plaintiff never provided to Progressive the radiology billing before suit was filed. *See* Ex. "2": Aff. of McMillen, ¶ 4.

22. Defendant's procedure that it followed in response to receiving Plaintiff's medical bills was to: (1) confirm the actual amount of the bill; (2) confirm the treatment charged for was related to the accident; (3) confirm whether any contractual payments and/or adjustments were made due to the presence of health insurance, and then confirm the patient balance. If the medical bills presented/obtained confirm payments and/or adjustments to the bill with no balanced billing of those amounts to the patient/insured,

then Progressive would only consider the amount paid by health insurance, plus the remaining patient balance, as part of its monetary evaluation in accordance with the legal training it received in applying § 3009.1, the Policy and Oklahoma case law.  In this case, Plaintiff's bill from Integris totaled $16,003.45. However, Plaintiff was insured with BlueCross/BlueShield.  As a result, Integris was contractually required to adjust or "write off" $14,605.73 after BlueCross/BlueShield paid Integris $1,253.09.  Plaintiff's patient balance owed to Integris was $144.63.  Thus, based upon Progressive's understanding of Oklahoma law and in reliance on the Policy, Plaintiff's allowable or "incurred" medical bill from Integris, for which Progressive considered, was $1,397.72.  *See* Ex. "2": Aff. of McMillen, ¶ 5.  Plaintiff admits he does not even remember paying the $144.63 he owed for the E.R. bill.  Plaintiff admits nobody has ever asked him to pay the $14,605.73 that was written off.  Plaintiff admits he did not pay the write off amount.  When asked if Plaintiff was claiming as damages the write off amount, Plaintiff stated: "I don't know, really."  *See* Ex. "1": Pl.'s Depo, p. 133:4 – 138:4.

23. Progressive employee McMillen testified that he and all other Progressive employees handling Oklahoma UIM claims are trained yearly on how to correctly apply § 3009.1, Oklahoma law, and the Policy to an Oklahoma UIM claim. That procedure is referenced above in paragraph 14.  *See also* Ex. "8": McMillen's depo, p. 40:14 – 41:22. Progressive employee Deady testified similarly when he stated he and other Progressive employees are trained yearly concerning how to properly apply § 3009.1 to a claim such as Plaintiff's.  *See* Ex. "9": Deady Depo. p. 14:21-25; 41:2 – 45:10; 50:9-14; 52:9-13;

53:6-19. Deady specifically testified Progressive employees utilize the legal training provided to apply § 3009.1, the Policy, and Oklahoma law (specifically including *Lee v. Bueno*), to claims such as Plaintiff's.

24. After reviewing the Demand Letter, and more than a hundred pages of attachments, Roell determined he had sufficient information with which to complete an accurate preliminary evaluation of Plaintiff's UIM claim. *See* Ex. "24": Aff. of Roell, ¶ 3.

25. On March 8, 2022, Roell completed his first evaluation of Plaintiff's UIM claim. Roelle allowed for $10,037.00 in medical bills and valued Plaintiff's pain and suffering to be $10,500.00. Importantly, considering Plaintiff's "unique situation"[1] Roell <u>doubled</u> the monetary evaluation for Plaintiff's pain and suffering as compared to what he would have normally allocated for an insured who underwent 3 months of conservative treatment and was not in a wheelchair. *See* Ex. "4": Roell Depo., p. 77:15 – 79:5; *see also* Ex. "24": Aff. of Roell, ¶ 5.

26. On March 9, 2022, Progressive sent correspondence to Mr. Bennett advising that Progressive did not evaluate Plaintiff's claim to be in excess of $25,000.00, and therefore, a valid UIM claim had not been presented. *See* Ex. "25": Letter dated 03/09/22.

27. On March 21, 2022, Mr. Bennett responded stating that Progressive should have spoken to Plaintiff before evaluating the UIM claim to better understand Plaintiff's "unique situation as a paraplegic with upper body injures." *See* Ex. "26": Corresp. dated

---

[1] A term used by Kevin Bennett not Progressive.

03/21/22. No mention was made that Plaintiff had recently finished a successful hunting season; recently finished second place in a marathon; was about to compete in another hand cycling event; or whether Plaintiff had the necessary shoulder surgery from the 2019 accident. Progressive was not informed that Plaintiff was still suffering from upper body injuries when the 2021 accident occurred due to the 2019 accident.

28. On April 7, 2022, Roell took a second recorded statement of Plaintiff. *See* Ex. "27": Trans. dated 04/07/22. Based upon the information obtained, Roell re-evaluated Plaintiff's claim to be between $18,037.00 and $23,037.00 (broken down: $10,037 and the remainder for non-economic damages). *See* Ex. "24": Aff. of Roell, ¶ 5. As the evaluation was still less than $25,000.00, Roell sent correspondence to Mr. Bennett advising a valid UIM claim had still not been presented. *See* Ex. "28": Letter dated 04/14/22.

29. In response, Plaintiff filed suit against Progressive in April 2022. *See* Dkt. 1-2. At the time Plaintiff filed suit he had: (1) no medical bills related to the 2021 accident that had not been paid in full (*see* Ex. "15") and (2) no lost wages because he was not working and was on Social Security Disability. *See* Ex. "29": Pl.'s Resp. to Def.'s ROGG No. 18; *see also* Ex. "1": Pl.'s Depo.: pp. 22:3-8 & 79:14 - 81:22. In summary, all of Plaintiff's economic damages stemming from the 2021 accident have been paid by U.S.A.A. and Plaintiff pocketed more than $5,000.00. As a result, the only legitimate dispute remaining concerns the value of Plaintiff's non-economic damages. Progressive determined Plaintiff's non-economic damages to be $13,000.00 and Plaintiff believes his non-economic damages should be valued higher.

## SUMMARY JUDGMENT

Summary judgment pursuant to Fed.R.Civ.P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Kendall v. Watkins*, 998 F.2d 848, 850 (10th Cir.1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 317, 106 S.Ct. 2548. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " *Id.* at 327, 106 S.Ct. 2548.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. In essence, the inquiry for the Court is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 250, 106 S.Ct. 2505. In its review, the Court construes the record in the light most favorable to the party opposing summary judgment. *Garratt v. Walker*, 164 F.3d 1249, 1251 (10th Cir.1998).

## ARGUMENT AND AUTHORITY

I. PROGRESSIVE IS ENTITLED TO SUMMARY JUDGMENT AS TO THE PLAINTIFF'S CLAIM FOR BREACH OF CONTRACT

The Plaintiff has sued Progressive for breach of contract. Because federal subject matter jurisdiction is predicated on diversity of citizenship, Oklahoma law governs the issue. *See, e.g., Universal Underwriters, Ins. Co. v. Winton*, 818 F.3d 1103, 1105-06 (10th Cir. 2016). To recover under a UM policy in Oklahoma the insured must be: (1) legally entitled to recover damages; (2) from owners and operators of uninsured or underinsured motor vehicles; (3) because of bodily injury. *Everaard v. Hartford Accident & Indem. Co.*, 842 F.2d 1186, 1189-90 (10th Cir. 1988)(*citing* 36 O.S. § 3636(B)).

Here, the Policy provides that Progressive will pay "for damages that an insured person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury[.]" *See* Dkt. No. 6-2, p. 10. An "uninsured motor vehicle" means, "…a land motor vehicle…d. to which a bodily injury liability bond or policy applies at the time of the accident, but the sum of all applicable limits of liability for bodily injury is less than the insured person's damages." *Id*. at p. 11.

It is undisputed that Jessica Maddox, the non-party that the Plaintiff was involved in the accident with, was insured for liability in the amount of $25,000.00. However, the

value of the Plaintiff's UM/UIM claim does not exceed $25,000.00. As set forth in Part II(A), the parties appear to agree that the non-economic value of the Plaintiff's UM claim ranges from $8,000.00 to $13,000.00. If the value of the economic damages portion of the Plaintiff's UM/UIM claim is less than $12,000.00, Progressive has no contractual obligation to pay the claim. For the reasons set forth in Part II(A), Progressive's initial evaluation of the Plaintiffs economic damages on March 8, 2022, was $10,037.00. As set forth in Prog.'s UMF #10, those damages are now $9,022.43 – both figures less than the $12,000.00 required. Accordingly, Progressive is entitled to summary judgment as to the Plaintiff's claim for breach of contract.

## II. PROGRESSIVE IS ENTITLED TO SUMMARY JUDGMENT AS TO THE PLAINTIFF'S CLAIM FOR BAD FAITH

Progressive moves for summary judgment on Plaintiff's claim for bad faith breach of insurance contract. Under Oklahoma law, an insurer has a duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received. *Christian v. Am. Home Assur. Co.*, 1977 OK 141, ¶ 25, 577 P.2d 899.

> "there can be disagreements between insurer and insured on a variety of matters such as insurable interest, extent of coverage, cause of loss, amount of loss, or breach of policy conditions. Resort to a judicial forum is not per se bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit. Rather, tort liability may be imposed only where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured."

*Id.*

In order for Plaintiff to recover damages for bad faith, he must first show that Progressive was required under the insurance policy to pay the Plaintiff's claim. *See* Inst.

No. 22.2, OUJI 3d (Rev. 2009). Where, as here, the value of Plaintiff's UM/UIM claim does not reach $25,000.00, the Court need examine the bad faith claim no further.

Where the Court determines that Progressive is required under the Policy to pay the UM/UIM claim, the Plaintiff must show that Progressive's refusal to pay it was unreasonable under the circumstances; that Progressive did not deal fairly in good faith with the Plaintiff; and the violation caused the Plaintiff injury. Inst. No. 22.2, OUJI 3d (Rev. 2009); *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993).

In order to determine whether the insurer acted in good faith, the insurer's actions must be evaluated in light of the facts the insurer knew or should have known at the time the insured requested the insurer to perform its contractual obligation. *Id.* at 1437. "[A] duty to timely and properly investigate an insurance claim is intrinsic to an insurer's contractual duty to timely pay a valid claim." *Brown v. Patel*, 2007 OK 16, ¶ 11, 157 P.3d 117; *see also McCorkle v. Great Atlantic Ins. Co.*, 1981 OK 128, ¶ 21, 637 P.2d 583)("[T]he tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under the policy[.]").

It is not a breach of the duty of good faith for an insurer to resort to a judicial forum to settle legitimate disputes as to the validity or amount of an insurance claim." *Garnett v. Government Employees Ins. Co.*, 2008 OK 43, ¶ 22, 186 P.3d 935. As a matter of law, "no reasonable inference of bad faith arises when an insurer denies a claim solely because of the existence of a legitimate dispute." *Oulds*, 6 F.3d 1431, 1442. If "...a reasonable jury could find in favor of the insurer based on all facts known or that should have been known

by the insurer when it denied a claim [such] is strong evidence that a dispute is 'legitimate.'" *Id.* Furthermore, the mere allegation that an insurer breached its duty of good faith and fair dealing does not automatically entitle the issue to be submitted to a jury for determination. *Oulds*, 6 F.3d at 1436.

> "Before the issue of an insurer's alleged bad faith may be submitted to the jury, the trial court must first determine as a matter of law, under the facts most favorably construed against the insurer, whether the insurer's conduct may be reasonably perceived as tortious.

*Garnett*, 2008 OK 43, ¶ 22.

The Tenth Circuit has held:

> "[a] jury question arises only where the relevant facts are in dispute or where the undisputed facts permit differing inferences as to the reasonableness and good faith of the insurer's conduct. On a motion for summary judgment, the trial court must first determine, under the facts of the particular case and as a matter of law, whether insurer's conduct may be reasonably perceived as tortious. Until the facts, when construed most favorably against the insurer, have established what might reasonably be perceived as tortious conduct on the part of the insurer, the legal gate to submission of the issue to the jury remains closed."

*Oulds*, 6 F.3d at 1436-37 (internal citations omitted).

Here, the Plaintiff makes two fundamental complaints about Progressive's handling of his claim: that Progressive neither (A) evaluated the results of its investigation properly, nor (B) performed a proper investigation in the first place. The Court should hold that there is no genuine issue of material fact as to either complaint and that Progressive is entitled to judgment as a matter of law.

A. <u>Progressive evaluated the results of its investigation properly</u>

The Plaintiff complains that Progressive failed to evaluate the results of its investigation properly because it wrongfully reduced the value of his economic damages claim by discounting (1) the adjusted/written-off portions of his medical bills and (2) administrative charges on his medical bills for the filing of liens. Both claims must fail.

**1. Progressive may consider adjustments a UM/UIM claimant's medical providers make to their bills when evaluating a UM/UIM claim**

On the date of the accident, the Plaintiff had $25,000.00 in UM/UIM coverage available to him. Progressive has evaluated the Plaintiff's non-economic damages to be in the range of $8,000 – $13,000. Progressive has allowed for $10,037.00 in medical bills, i.e. economic damages. Because this total amounts to a range of $18,037.00 – $23,037.00, Progressive has informed the Plaintiff that a valid UM/UIM claim has not been presented.

The Plaintiff does not dispute Progressive's non-economic damages evaluation. *See* Dkt. #46, p. 15 ("…Plaintiff specifically does not dispute the final non-economic value range of $8,000.00 – $13,000.00.) However, the Plaintiff does dispute Progressive's evaluation of his economic damages. The Plaintiff argues that Progressive should have valued his medical bills at $28,249.46, not $10,037.00. The Plaintiff's evaluation constitutes the sum of his provider's bills, not the amount that was actually paid to the providers in full and final settlement of his bills. That is the crux of this dispute. Does an insurance carrier who values a UM/UIM claimant's economic damages based on the amounts owed, rather than billed, handle a UM/UIM claim in bad faith?

The answer is 'no'. The Policy provides that Progressive "will pay for damages that an insured person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury..." *See* Dkt. #6-2, p. 10. Oklahoma law provides that the Plaintiff is not "entitled to recover" the full amount his medical providers billed him – he can only recover "the actual amounts paid", per 12 O.S. Supp. 2015 § 3009.1:

> "Upon the trial of any civil action arising from personal injury, the actual amounts paid for any services in the treatment of the injured party, including doctor bills, hospital bills, ambulance service bills, drug and other prescription bills, and similar bills shall be the amounts admissible at trial, not the amounts billed for such expenses incurred in the treatment of the party."

The Plaintiff argues that 3009.1's provisions do not apply to the evaluation of his UM/UIM claim, for two reasons. First, he claims that Oklahoma law bars a UM/UIM carrier from applying defenses a tortfeasor could assert in response to an insured's tort claim when evaluating said insured's first party UM/UIM claim. *See* Dkt. 36. None of those cases actually address whether 3009.1 applies to UM/UIM claims, however. In *Perry v. Safeco Ins. Co. of America*, 18-cv-539-TCK-FHM (N.D. Okla. 2020), the court did address this 3009.1 in the context of a claim of bad faith handling of a UM/UIM claim. As here, the tortfeasor had $25,000.00 in liability coverage that was paid to Perry. Perry also had UIM coverage of $50,000.00 through Safeco. As here, Perry's counsel submitted medical-related expenses of $27,948.34 to Safeco. Of that amount, Perry's health insurer paid the service providers $7,032.31. Safeco argued that only the actual amounts paid for any service in treatment of Plaintiff were admissible, citing § 3009.1. Judge Kern agreed with Safeco, finding that "only the actual amounts paid in treatment of Plaintiff are

admissible. OKLA 19 STAT. tit. 12, § 3009.1." *Id*. at *4.

Second, even if 3009.1 can be applied to the evaluation of UM/UIM claims, as a general proposition, the Plaintiff argues that 3009.1's provisions don't apply here. This is so, he claims, because Progressive hasn't actually collected signed statements acknowledged by the medical providers that have adjusted their bills saying the provider will accept the amount paid as full payment of the obligation. The Plaintiff's argument ignores Subsection C:

> "<u>If no bills have been paid, or</u> no statement acknowledged by the medical provider or sworn testimony as provided in subsections A and B of this section is provided to the opposing party and listed as an exhibit by the final pretrial hearing, then the amount billed shall be admissible at trial subject to the limitations regarding any lien filed in the case."

12 O.S. 3009.1(C)(underscore added).

If the bills at issue have been paid, the statements are not required. Only if the bills have not been paid does a party need to obtain sworn statements and/or testimony from the providers. Of the bills provided to Progressive during claims handling, one of the bills reflected adjustments applied by Plaintiff's health insurer, BlueCross/BlueShield. Plaintiff's medical bill from Integris was paid by BlueCross/BlueShield, and he was not balance billed for the amounts that were adjusted/written off. The Integris bill has been paid, which vitiates any obligation of Progressive to obtain signed statements or sworn testimony. *See* Def.'s UMF 10; *see also* Ex. "11". Progressive properly considered the paid amounts pursuant to its process and Oklahoma law.

Even if the Court determines that a UM/UIM claimant is "legally entitled to recover" the amounts billed, rather than the amounts paid, from his medical providers,

despite the provisions of Section 3009.1, Progressive is still entitled to summary judgment regarding the Plaintiff's bad faith claim. For bad faith liability to attach, the law at the time of the alleged bad faith must be settled. *Davis v. Mid-Century Ins. Co.*, 311 F.3d 1250, 1252 (10thCir. 2002)(*citing Skinner v. John Deer Ins. Co.*, 2000 OK 18, 19, 998 P.2d 1219.); *see*, *e.g. Higgins v. State Auto Prop. & Cas. Ins. Co.*, 11-cv-90-JHP-TLW (N.D. Okla. 2012)(carrier did not act in bad faith where its "legal position was reasonable in light of the lack of legal clarity with respect to any partial payment requirement").

There is no controlling authority, from the Oklahoma Supreme Court or the Tenth Circuit, holding that it is improper for an insurance company to apply § 3009.1 to an Oklahoma UIM claim. In his Reply to Progressive's response to his MPSJ, the Plaintiff points to three orders – two federal, one state – from courts adjudicating motions in limine addressed to the admissibility of 3009.1 evidence. These orders do not show that the law regarding the use of 3009.1 in UM/UIM case evaluations is "settled". First of all, none of these orders directly address the underlying question. Even if they did, none of them constitute controlling authority; in fact, though public record, none of these opinions are even published.

In sum, Progressive is entitled to summary judgment as to the Plaintiff's claim that Progressive breached its duty to handle his claim in good faith because the law regarding use of 3009.1 in UM/UIM evaluations remains unsettled.

## 2. Progressive properly discounted Plaintiff's medical providers' administrative charges for the filing of liens regarding their bills

The Plaintiff submitted medical bills from eight (8) medical providers as part of his

claim. Bills from three (3) of those providers include an administrative charge – $50.00, in each case – for the purported cost to the provider of obtaining a lien on the bill. *See* Ex. "11": Medical Liens.

The UM/UIM insuring agreement in the Policy states "[i]f **you** pay the premium for this coverage, **we** will pay for *damages than an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** because of **bodily injury**[.]" *See* Dkt. No. 6-2, p. 10 (emphasis added). The Plaintiff insists that a UM/UIM claimant "is legally entitled to recover" these charges as damages from the tortfeasor, therefore Progressive was wrong to deduct them from the value of his claim. This argument must fail for two reasons.

First, these fees are not a cost incurred by Plaintiff for his "medical care or treatment." They are an administrative cost, inherent in the business of treating persons on a lien basis. To argue otherwise would require Progressive to consider any other administrative fees a provider decides to place on a bill, such as a hypothetical $10.00 surcharge for electricity or postage.

Second, two of these providers hadn't incurred any cost before charging a fee for filing the lien. Lien-filing fees were, in two of the providers' bills (Advanced Physical Therapy and The Broadway Clinic), charged on the first day Plaintiff presented for treatment. *See* Ex. "11" at WILLIS 3803 & 3983. These dates were months prior to these providers actual filing their liens. *See id*. at file stamp on WILLIS 3802 & 3979.

Third, these providers charged nearly double the amount they actually paid to the government to file their liens. Indeed, Advanced Physical Therapy listed a lien filing fee

charge of $50.00 on its bill, but a review of the filing stamp on its lien reveals that it only paid a $26.00 filing fee. (*See id.* at WILLIS 3802 & 3803). As for The Broadway Clinic, it also listed a lien filing fee charge of $50.00 but, as the filing stamp reflects, only paid a $24.00 filing fee. *See id.* at WILLIS 3979 & 3983. Finally, Midtown Imaging Service listed a lien filing fee of $50.00, only to pay a $22.00 filing fee. *See id.* at WILLIS 4096 & 4097. Not only are the Lien Providers attempting pass on to Plaintiff costs that are purely administrative and inherent in the business of choosing to treat individuals on a lien basis only, they are attempting to profit off of doing so.

Fourth, the record shows that the Plaintiff never paid the lien filing fees. Plaintiff's counsel asked Plaintiff under oath if the lien fees were "something you ultimately had to pay?" and Plaintiff responded "no". *See* Ex. "1": Pl.'s Depo, p. 209:16-18. The first time Plaintiff became aware that a $50 lien charge was on the medical bill was during his deposition in November 2022. *Id.* at p. 140:7-23. Plaintiff had no understanding why there were lien filing charges on his bills. *Id.* at 142:10-21. The record shows that once Plaintiff settled with the underlying tortfeasor and USAA, the lien providers ultimately wrote-off a total of **$2,486.00** from their bills **after** receiving payment from Mr. Bennett. *See* Progressive's UMF 10. Specifically, Advanced Physical Therapy wrote-off $1,366.00 from its bill, The Broadway Clinic wrote-off $620.00, and Midtown Imaging Service wrote-off $500.00. *See id.* Then the Lien Providers released "Billie Willis," "USAA Insurance," and/or "Progressive Insurance" from "any kind of nature, arising from, and by reason of treatment given to BILLIE WILLIS[.]" *See* Ex. "11": Lien Releases

In sum, the Plaintiff is not "legally entitled to recover" these administrative costs to

the provider as damages from the tortfeasor. Therefore, Progressive was within its right to deduct them from the value of the Plaintiff's UM/UIM claim.

B. <u>Progressive performed a proper investigation</u>

Plaintiff alleges Progressive did not investigate the UIM claim until March 7, 2022. This is not true. *See* Prog.'s UMFs 13 & 17. Plaintiff alleges Defendant denied his claim on March 8, 2022. This is not true. *See* Dkt. #43, p. 13, ¶ 27. Plaintiff alleges Defendant ignored two of Plaintiff's medical bills. This is not true. *See* Prog.'s UMFs 19-21. Progressive had a reasonable belief in March 2022 that Plaintiff's UIM was factually insufficient, allowing it to delay payment of UIM benefits to Plaintiff. Progressive took its first recorded statement of Plaintiff on September 13, 2021, at which time Plaintiff said he was still in some pain but trying to hang in there. *See* Prog.'s UMF 13. On October 14, 2021, Progressive advised Plaintiff of his UIM coverage available for the 2021 accident. *See* Prog.'s UMF 15. On February 25, 2022, Plaintiff first advised Progressive he desired to present a UIM claim. *See* Prog.'s UMF 16. In response, Progressive immediately opened a UIM claim for Plaintiff and discussed Plaintiff's injuries with Plaintiff's counsel the same day. *See* Prog.'s UMF 17. Progressive requested Plaintiff's counsel to provide the medical records and bills, which Mr. Bennett did provide the majority of on March 6, 2022. *See* Prog.'s UMF 19 & 20. Progressive reviewed the medical bills and records provided and determined Plaintiff's economic damages to be $10,037.00 and his non-economic damages to be no greater than $10,500.00. *See* Prog.'s UMF 25. Progressive has provided the court with a full accounting of its process in determining why Progressive only allowed for $10,037.00 in medical bills. *See* Prog.'s

UMF 22-23. Ultimately, it is undisputed that had Progressive continued further investigation into the allowable medical bills, Plaintiff would have been only allowed $9,022.43 in medical bills. *See* Prog.'s UMF 10. Progressive then took a second statement of Plaintiff. *Id.* at 28. After the second statement, Progressive reevaluated Plaintiff's UIM claim and allowed for $10,037.00 in medical bills and $13,000.00 in non-economic damages. *Id*.

There is no genuine issue of material fact as to whether Progressive performed a proper investigation. Accordingly, Progressive is entitled to judgment as a matter of law regarding the Plaintiff's bad faith claim.

## III.  PROGRESSIVE IS ENTITLED TO SUMMARY JUDGMENT AS TO THE PLAINTIFF'S CLAIM FOR PUNITIVE DAMAGES

The Plaintiff claims he is entitled to punitive damages for bad faith breach of contract. The Plaintiff must prove that Progressive recklessly disregarded its duty to deal fairly and act in good faith with the Plaintiff, or intentionally and with malice breached said duty. To prove reckless disregard, the Plaintiff must show that:

> "[Progressive] was either aware, or did not care, that there was a substantial and unnecessary risk that its conduct would cause serious injury to Plaintiff. In order for [Progressive] to have recklessly disregarded its duty to deal fairly and act in good faith with its insured, its conduct must have been unreasonable under the circumstances, and also there must have been a high probability that the conduct would cause serious harm to Plaintiff."

Inst. No. 22.5, OUJI 3d (Rev. 2009).

"Malice" involves either hatred, spite, or ill-will, or else the doing of a wrongful act intentionally without just cause or excuse." *Id.*

Here, even if the Court finds that the Plaintiff's bad faith claim is a matter for the jury, there is no evidence that would enable a reasonable jury to conclude that Progressive breached its duty to deal and act in good faith with the Plaintiff either intentionally, with malice, or with reckless disregard for said duty. Accordingly, Progressive is entitled to summary judgment as to the Plaintiff's claim for punitive damages.

## CONCLUSION

There are no genuine issues of material fact as to the Plaintiff's claims for breach of contract, bad faith and/or punitive damages, and Progressive is entitled to judgment as a matter of law regarding each.

**WHEREFORE**, premises considered, Progressive Direct Insurance Company respectfully requests summary judgment in its favor, and against the Plaintiff, with such other relief the Court deems just and equitable.

Respectfully Submitted by:

**STARR, BEGIN & KING**

s/Bradley E. Bowlby_____
Christopher C. King, OBA #18578
Bradley E. Bowlby, OBA #22847
1800 S. Baltimore, Ste 550
Tulsa, OK 74119
Tel: (918) 872-0374
Fax: (918) 872-0381
Email: kris.king@tulsalawyer.org
        brad.bowlby@tulsalawyer.org
***Attorneys for Defendant Progressive***

## CERTIFICATE OF MAILING

I hereby certify that on June 1, 2023, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Jason Waddell

s/Bradley E. Bowlby_____

330-101